UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DHANRAJ AJNOHA, a/k/a SHIVNAUTH
SRIPRASAD DHANRAJ, and DHANRAJ
AJNOHA, a/k/a SHIVNAUTH SRIPRASAD
DHANRAJ, as Fiduciary to the Estate of
Indrine Ajnoha,                                                        **MEMORANDUM AND ORDER**
                                                                               Case No. 02-CV-3769 (FB) (VVP)

                                  Plaintiff,

              -against-

JC PENNEY LIFE INSURANCE
COMPANY, n/k/a STONEBRIDGE LIFE
INSURANCE COMPANY,

                                  Defendant.
-------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*                                    *For the Defendant*:
RICHARD H. APAT, ESQ.                      STEPHEN R. HERBERT, ESQ.
Pearlman, Apat & Futterman              Locke & Herbert
80-02 Kew Gardens Road                   1114 Avenue of the Americas, 40th Floor
Kew Gardens, NY 11415                     New York, NY 10036

**BLOCK, Senior District Judge:**

Plaintiff, Dhanraj Ajnoha, seeks recovery on an accident policy issued to his late

wife, Indrine Ajnoha, by defendant, JC Penney Life  Insurance Company, now known as

Stonebridge Life Insurance Company ("Insurance Company").  Suing on his own behalf,  plaintiff

claims that the Insurance Company failed to pay $1,000,000 in benefits owed under the policy's loss

of life provision; suing on behalf of Ms. Ajnoha's estate, he claims that the insurance company

failed to pay $1,000,000 in benefits owed under the policy's loss of eyesight provision.  As the

policy precludes recovery under more than one provision, plaintiff pursues these claims in the

alternative.

The Insurance Company moves (1) for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that recovery for either claim is barred by the terms of the policy; and (2) if the complaint is not dismissed, for an order striking plaintiff's demand for a jury trial. Plaintiff opposes defendant's motions and cross-moves for summary judgment on the accidental death claim on the ground that the policy provision requiring death to occur within 90 days of the accident is against public policy as applied to the present facts; he does not cross-move for summary judgment on the loss of sight claim.

For the reasons stated below, the Insurance Company's motion for summary judgment is granted with respect to the loss of sight claim. With respect to the accidental death claim, the parties' motions for summary judgment are denied and the Insurance Company's motion to strike plaintiff's jury demand is granted; the case will proceed to trial before the Court on the factual issues hereafter identified.

## I.

The following facts are taken from the parties' Rule 56.1 Statements and other submissions. Many facts are undisputed, but others, where indicated, are sharply in dispute – particularly with regard to the medical evidence.

### A. Certificate of Insurance

On or about November 2, 2000, plaintiff's wife Indrine Ajnoha purchased a Group Accidental Death and Dismemberment policy issued by the Insurance Company. The Certificate of Insurance ("the Certificate") outlines the policy's terms and states, in relevant part:

> INJURY means bodily injury caused by an accident occurring while the insurance is in force resulting . . . directly and independently of all other causes; and . . . within 90 days of the date of the accident.

> LOSS means . . . Loss of life [or] with reference to eyes, the irrevocable loss of the entire sight thereof.

COVERAGE . . . If a Covered Person is Injured while Occupying, as a fare-paying passenger, a public conveyance provided and operated by a duly licensed common carrier for regular passenger service by land . . . we will pay the applicable benefit . . . .

SCHEDULE OF BENEFITS . . . If, as a result of Injury occurring under any of the circumstances listed in the Coverage section . . . a Covered Person suffers [a loss] within 90 days after the date of an accident which caused such injury, then we will pay [the principal sum of one million dollars for loss of life or sight of both eyes] . . . Only one of [those] benefits . . . will be paid for injuries that result from one accident for each Covered person.

EXCLUSIONS  No benefit shall be paid for Loss or injury that . . . is due to disease, bodily or mental infirmity, or medical or surgical treatment of these.

NOTICE OF CLAIM  Written notice of claim must be given to us within 30 days after it occurs or as soon as possible. . . . The notice should give your name and Certificate number as shown on the Schedule page.

CLAIM FORMS  When we receive Notice of Claim, we will send the claimant forms for filing Proof of Loss.  If we do not send them within 15 days, the claimant can meet the proof of loss requirement by giving us a written statement of what happened.  We must receive this statement within the time given for filing proof of loss.

PROOF OF LOSS  Written proof of loss must be given to us within 90 days after the date of the Loss or as soon as reasonably possible.

PAYMENT OF CLAIMS   Loss of life benefits are payable in accordance with the beneficiary designation in effect at the time of payment.  Other benefits will be paid to you.  Any other benefits, other than for Loss of life, unpaid at your death may be paid, at our option, either to your beneficiary or estate.

LEGAL ACTIONS  No action can be brought to recover . . . more than 3 years after the date Proof of Loss is required.

Second Am. Compl., Ex. A (Certificate of Insurance) ("Certificate") at 3, 4, 5, 8.  The policy was in force from the time of purchase up to and including the date that Ms. Ajnoha was pronounced dead at the hospital on November 10, 2001.

Plaintiff is the named beneficiary under the policy. Pursuant to preliminary letters testamentary issued by the New York Surrogate's Court on January 26, 2005, and again on January 9, 2006, plaintiff was named fiduciary of Ms. Ajnoha's estate. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J., Exs. F, G (Preliminary Letters Testamentary). Although the Surrogate's Court has not yet issued final letters testamentary, plaintiff was again named as fiduciary in preliminary letters issued on February 7, 2007; those letters do not expire until August 6, 2007. *See* Ex. to Letter of Richard H. Apat (Feb. 8, 2007).

## B. Accident and Treatment

On April 9, 2001, while Ms. Ajnoha was riding the "F" train to work, the train lurched forward causing her to hit her head on a vertical pole and fall to the floor. At approximately 5:00 p.m. the same day, she was admitted to a nearby hospital; she fell into a coma later that day. Emergency room staff determined that she was in respiratory distress and immediately commenced mechanical ventilation. Within hours of her admission, hospital staff drilled a hole in her skull and inserted a tube to relieve the pressure caused by a build-up of cerebrospinal fluid ("CSF"), *see* Pl.'s Cross-Mot. for Summ. J., Aff. of Norman A. Ernst Jr., M.D. ("Ernst Aff.") ¶ 10; the tube was kept in place until April 17th, when it was no longer needed. *See id.*

By April 18, 2001, treating doctors listed Ms. Ajnoha's prognosis as "poor," noting that she showed "no improvement." *Id.*, Ex. R (Physician's Progress Record dated Apr. 18, 2001). By April 25th, she was described as being "in a vegetative state." *Id.*, Ex. S (Physician's Progress Record dated Apr. 25, 2001). By June 1st, her physicians had begun to discuss the possibility that further treatment was futile. *See id.*, Ex. U (Physician's Progress Record dated June 1, 2001) ("Will discuss medical futility with Dr. Miller").

Plaintiff avers that in mid-June he "was approached [by the doctors] and told that

there was really no chance of her recovering and surviving and . . . was asked whether or not she should be removed from life support." Pl.'s Cross-Mot. for Summ. J., Aff. of Dhanraj Ajnoha ("Pl.'s Aff.") ¶ 4. In reply, plaintiff "indicated firmly that [he] wanted to hold out hope and [he] did not want her removed from life support"; furthermore, "[he] opposed removing her from life support every time [he] was asked this question by the medical staff." *Id.* ¶ 5. Although, as described in the following section, plaintiff and defendant offer sharply contrasting interpretations of the medical evidence, defendant does not dispute that plaintiff made an affirmative decision to keep Ms. Ajnoha on life support.

Ms. Ajnoha remained in the hospital, her breathing maintained artificially, until she was pronounced dead on November 10, 2001, just over seven months after the date of the accident. An autopsy performed on November 11, 2001, revealed the cause of death to be "[m]ultiple complications of increased intracranial pressure with transtentorial herniation due to noncommunicating hydrocephalus of undetermined etiology." Def.'s Mot. for Summ. J., Ex. E (Report of Autopsy).

## C. Diverging Medical Opinions

In support of its motion for summary judgment, defendant submits the opinions of Drs. Paul J. Connors and Neil R. Miller. In opposition, plaintiff submits those of Drs. Ernst, Stephen M. Bloomfield, Noel Fleischer, Paul Lerner, Michael L. Lipton, and Richard B. Raynor. Although all of these doctors base their opinions on the same medical records, they reach very different conclusions regarding Ms. Ajnoha's brain functioning and life expectancy after the accident, the extent of her loss of sight, and the nature of her preexisting condition.

### 1. *Loss of Brain Functioning and Impact on Life Expectancy*

The doctors disagree as to the extent of Ms. Ajnoha's loss of brain functioning after

the accident. Dr. Fleischer opines that she "was 'brain dead' by June 11, 2001." Pl.'s Cross-Mot. for Summ. J., Aff. of Noel Fleischer, M.D. ¶ 9. Dr. Connors concedes that she "was diagnosed with a Persistent Vegetative State," but states that "[t]he medical records . . . do not indicate that [she] was formally diagnosed as brain dead." Def.'s Supp. Mot. for Summ. J., Aff. of Paul J. Connors, M.D. ("Connors Aff.") ¶ 5.

Dr. Ernst opines that Ms. Ajnoha's brain damage left her reliant on artificial means of life support, stating that she "would have died in less than 48 to 72 hours . . . if extraordinary measures were not undertaken," and that "[a]t any point during the first 90 days post accident, the discontinuing of those heroic measures would have resulted in [her] death within a 24-hour period." Ernst Aff. ¶ 3. In contrast, Dr. Connors opines that Ms. Ajnoha's recovery could have led to an "eventual complete weaning from all ventilator assistance" based on the findings of a hospital consultant that she demonstrated "spontaneous respirations and spontaneous breathing" on August 7, 2001, almost four months after the accident. Connors Aff. ¶ 10.

## 2. Loss of Sight

The doctors also disagree as to the extent of Ms. Ajnoha's loss of sight. Dr. Raynor opines that Ms. Ajnoha "was blind . . . from or shortly after her admission to [the] hospital on April 9, 2001." Def.'s Mot. for Summ. J., Ex H (Report of Richard B. Raynor, M.D.) at 3. Although he does not state when the loss of sight occurred, Dr. Lipton confirms that "[h]erniation [in the brain] rapidly led to infarction and necrosis at multiple points in the visual pathway . . . that caused permanent loss of vision." Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. E (Report of Michael L. Lipton, M.D.) at 2. In contrast, Dr. Miller opines that Ms. Ajnoha still "had some vision in both eyes . . . at the time of her death." Def.'s Supp. Mot. for Summ. J., Supp. Affirmation of Stephen R. Herbert, Ex. A (Report of Neil R. Miller, M.D. ("Miller Report")) at 2.

### 3. Preexisting Condition

Although Dr. Lerner opines that "[t]here is no evidence in the medical record suggesting a pre-existing medical condition . . that may have predisposed to [sic] or caused [the injury]," Def.'s Mot. for Summ. J., Ex. O (Report of Paul Lerner, M.D. ("Lerner Report")) at 2, both Dr. Bloomfield (for plaintiff) and Dr. Miller (for defendant) agree that Ms. Ajnoha had a small colloid cyst in her brain at the time of the accident. The doctors also agree that the cyst played some role in her death: Dr. Bloomfield opines that "the sole cause of [her] death was the head trauma, which caused the colloid cyst to burst," Pl.'s Opp'n to Def.'s Supp. Mot. for Summ. J., Aff. of Stephen M. Bloomfield, M.D. ("Bloomfield Aff.") ¶ 3; Dr. Miller opines that "the injury . . . caused the cyst to shift its position, causing a rapid buildup of CSF pressure, leading to the subsequent medical events and, ultimately, the deceased's death," Miller Report at 1.

Drs. Bloomfield and Miller disagree, however, about the extent to which the cyst affected Ms. Ajnoha health before the accident and how it affected her overall life expectancy. According to Dr. Bloomfield, the cyst was "asymptomatic before the happening of the head trauma," and Ms. Ajnoha "could have lived her entire normal life expectancy without incident." Bloomfield Aff. ¶ 3. Dr. Miller disagrees, citing past treatment records in support of his opinion that, nine months before the accident, the cyst "was intermittently causing the normal flow of [CSF] to stop, causing the fluid to build up, producing . . . headache[s]." Miller Report at 1.

### D. Notice of Claim and Proof of Loss

### 1. Accidental Death

Plaintiff's counsel notified the Insurance Company of Ms. Ajnoha's death by telephone on November 16, 2001, over seven months after the accident and six days after she was pronounced dead. The Insurance Company reduced the telephone conversation to a written record

– including Ms. Ajnoha's name, policy number, and a notation that the cause of her death was "head trauma/train" – and submitted the information to its claims department. Def.'s Mot. for Summ. J., Ex. C (Notice of Death). In a sworn deposition, an Insurance Company representative acknowledged that no formal notice of claim was required, stating that "what we would consider as Notice of Claim is a phone call." Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. A (Dep. of Charles K. Costa dated Oct. 20, 2005) at 135.

On November 21, 2001, the Insurance Company sent plaintiff a set of claim forms to be completed as proof of accidental death, instructing plaintiff to submit a completed Affidavit of Claimant with Attending Physician Statement, a certified copy of the death certificate, and "a copy of any police, autopsy or other official reports" in his possession. Def.'s Mot. for Summ. J., Ex. D (Letter). Plaintiff's counsel had difficulty obtaining some of these reports; "[he] brought the policy language to their attention dealing with the 90-day period and was told that as long as [he] got the documents in as soon as [he] could, there would be no problem." Pl.'s Opp'n to Def.'s Mot. for Summ. J., Affirmation of Herbert Noel Steinberg ¶ 9.

On March 28, 2002, plaintiff's counsel submitted (1) a signed Affidavit of Claimant including policy information, the name of the hospital where Ms. Ajnoha was treated, and a brief description of the accident; (2) a copy of the autopsy report; (3) an uncertified copy of the death certificate; and (4) reports from the New York City Police and New York City Transit Authority describing each department's response to the events of April 9, 2001. At the Insurance Company's request, plaintiff submitted a certified copy of the death certificate on April 15, 2002. On April 22, 2002, the Insurance Company informed plaintiff that it was in the process of obtaining hospital records and records from the New York City Transit Authority; the Insurance Company did not make any further requests of plaintiff regarding proof of loss for accidental death.

On October 23, 2003, plaintiff served defendant with the report of Dr. Lerner; the report contained Dr. Lerner's conclusion, based on his review of the medical records, that "the acute obstructive hydrocephalus from which [she] suffered from was causally related to the head injury she sustained . . . [and] that it was the acute obstructive hydrocephalus which together with related complications led to her . . . ultimate demise." Lerner Report at 2-3. Dr. Lerner's report did not, however, contain any discussion or reference to Ms. Ajnoha's loss of sight.

### 2. Loss of Sight

On December 4, 2003, plaintiff told the magistrate judge that he intended to pursue a loss of sight claim in addition to the accidental death claim. On or about January 30, 2004, plaintiff served defendant with Dr. Raynor's report – the first of plaintiff's submissions to include a medical opinion that Ms. Ajnoha lost her sight, and that her loss was caused by the accident.

Notwithstanding the submission of Dr. Raynor's report, plaintiff asked defendant on October 25, 2005, whether a separate form existed for proof of loss of sight. On November 7, 2005, defendant provided plaintiff a form entitled "Claimant's Statement for Loss of Sight or Limb" that requested general information about Ms. Ajnoha's policy, medical history, and a brief description of her loss of sight; the form also contained a portion to be completed by Ms. Ajnoha's attending physician. On December 23, 2005, plaintiff submitted the form with all portions completed except for the physician statement.

On December 28, 2005, plaintiff served defendant with the report of Dr. Lipton, supporting Dr. Raynor's conclusions regarding Ms. Ajnoha's loss of sight.

### E. Procedural History

On May 14, 2002, plaintiff commenced this action in New York State court; his complaint asserted only the accidental death claim and did not demand a jury trial. On July 8, 2002,

defendant removed the action to this Court based on diversity; on November 6, 2002, defendant filed its answer.

On May 14, 2004, during a pre-motion conference before the Court, the parties stipulated that plaintiff could amend the complaint to include the loss of sight claim. *See* Docket Entry No. 26 (Minute Entry). Plaintiff filed an amended complaint on June 15, 2004, asserting loss of sight as a second cause of action; also asserted therein, for the first time, was plaintiff's demand for a jury trial.

After obtaining leave from the Court, plaintiff filed another amended complaint on December 27, 2006, amending the caption to also include plaintiff in his capacity as fiduciary to the estate and to reflect defendant's name change.[1]

## II.

### A. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact to be tried and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has carried its burden to demonstrate the absence of a genuine issue of material fact, *see Celotex Corp.*, 477 U.S. at 323, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (quoting Fed. R. Civ. P. 56(e)) (other citations omitted). "[T]he Court is obligated to search the record and independently determine whether or not a genuine issue of fact exists." *Jiminez v. Dreis & Krump Mfg. Co., Inc.*, 736 F.2d 51, 53 (2d Cir. 1984) (quotation marks and citation omitted). In so doing, the Court "resolve[s] all ambiguities and draw[s] all factual inferences in favor

---

[1]Defendant acknowledges that it adopted the name "Stonebridge Life Insurance Company" after plaintiff commenced this action. *See* Def.'s Mot. for Summ. J. at 1-2.

of the nonmoving party." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**B.  Standing to Assert Loss of Sight Claim**

Under the Certificate, the loss of life benefit is paid according to the insured's beneficiary designation.  Defendant does not dispute that plaintiff is the named beneficiary and, therefore, that he has standing to pursue the accidental death claim.

With respect to benefits other than for loss of life, the Certificate states that benefits unpaid at the time of the insured's death "may be paid, at [the Insurance Company's] option, either to [the insured's] beneficiary or estate."  Certificate at 8. Defendant interprets that provision to mean that "the Estate of the Insured[ ] is the proper beneficiary for any accidental Loss of Sight benefit that may be payable."  Aff. of Charles K. Costa ¶ 23.  Based on this interpretation, defendant argues that plaintiff lacks standing because he has not been appointed administrator of Ms. Ajnoha's estate.

The Court need not pass upon defendant's interpretation of its payment options for the loss of sight benefit because plaintiff plainly has standing to pursue claims on behalf of Ms. Ajnoha's estate.[2]  The Surrogate's Court, through the issuance of preliminary letters testamentary, has designated plaintiff as preliminary executor of his wife's estate, "[conferring] upon [him], subject to any limitations contained in the instrument offered for probate, all the powers and authority and [subjecting] him to all the duties and liabilities of an administrator except . . . [the] power to pay or satisfy a legacy or distributive share."  N.Y. Surr. Ct. Proc. Act § 1412(3)(a).

**C.  Proof of Loss**

_____

[2]The Court notes, however, that it is disingenuous to suggest that an insurance company could defeat an otherwise valid claim by "opting" to pay it to an estate having no representative.

Under New York law,[3] accident insurance policies must contain a proof of loss provision. *See* N.Y. Ins. Law § 3216(d)(1)(G). Prior to 1951, the statute required a provision imposing a strict 90-day time limit on providing proof of loss; failure to comply barred recovery on the policy. *See Bland v. Trevvett,* 256 N.Y.S.2d 644, 646 (4th Dep't 1965) ("The failure to comply with the [proof of loss provision of] the policy and the statute controlling it require a dismissal of the complaint."). Amended in 1951 to assuage the harsh effects of the prior rule, *see* 1951 N.Y. Laws ch. 630, the statute now provides that "[f]ailure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible." N.Y. Ins. Law § 3216(d)(1)(G). Defendant's policy incorporates that statutory proviso, requiring proof of loss "within 90 days after the date of the Loss *or as soon as reasonably possible*." Certificate at 8 (emphasis added).

Defendant argues that plaintiff's proofs of loss on both the accidental death and loss of sight claims were untimely. Plaintiff does not dispute that he failed to submit proof of loss within 90 days, but argues that (1) proof of loss for the accidental death claim, submitted on March 28, 2002, was filed "as soon as reasonably possible"; and (2) since the medical records supporting both claims are identical, proof of loss of sight was available to defendant as early as March 28, 2002.

"As soon as reasonably possible" simply means "within a reasonable time under all of the circumstances." *Great Canal Realty Corp. v. Seneca Ins. Co.*, 5 N.Y.3d 742, 743 (2005). New York courts have noted that a determination of "reasonable time" "necessarily includes a determination of the diligence of claimant," *Motor Vehicle Accident Indem. Corp. v. Brown*, 223

---

[3] Because this is a diversity case, New York substantive law governs. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

N.Y.S.2d 578, 578 (2d Dep't 1961); *see also Nationwide Mut. Ins. Co. v. Edgerson*, 600 N.Y.S.2d 560, 561 (2d Dep't 1993), but have not otherwise delineated the circumstances to be considered. In *Morningstar v. Insurance Co. of North America,* 295 F. Supp. 1342 (S.D.N.Y. 1969), a federal district court applying New York law considered evidence that the "delay in supplying the proof of loss was occasioned by [the insured's] hospitalization and convalescence, combined with the fact that his attorneys instructed him not to communicate with anyone about the collision," as well as the insurer's concession that it "had not been prejudiced by the delay in filing the proof of loss," *id.* at 1346; based on these considerations, the court found that "proof of loss could not reasonably have been furnished sooner, and was furnished as soon as reasonably possible." *Id.*

*Morningstar* is consistent with cases defining "reasonable time" in other contexts. For example, a motion for relief from judgment under certain subsections of Federal Rule of Civil Procedure 60(b) must be made "within a reasonable time." The Second Circuit has held that "[w]hat qualifies as a reasonable time . . . will ordinarily depend largely on the facts of a given case, including the length and circumstances of the delay and the possibility of prejudice to the opposing party." *In re Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981).[4] Similarly, in deeming a notice of claim against a municipal agency timely, the Appellate Division, First Department, noted in *Application of Harrison,* 591 N.Y.S.2d 37 (1st Dep't 1992)*,* that the agency "received notice of claim only one month after the expiration of the 90-day period, which is a 'reasonable time thereafter' within the meaning of General Municipal Law § 50-e(5), and [the agency] failed to

---

[4]Section 5015 of New York's Civil Procedure Law and Rules governs motions for relief from state-court judgments. Although § 5015, does not, with one exception, contain an express time limit, it has been interpreted to require, like Rule 60(b), that such motions be made "within a reasonable time." *Richardson v. Richardson*, 765 N.Y.S.2d 388, 390 (2d Dep't 2003). While there appears to be no New York case considering prejudice in the determination of what constitutes a reasonable time under § 5015, the state rule was derived from Rule 60(b), and is intended to be applied similarly. *See Commercial Structures, Inc. v. City of Syracuse*, 468 N.Y.S.2d 957, 958 (4th Dep't 1983).

demonstrate any significant prejudice to its ability to investigate the claim arising from this one-month delay." *Id* at 38.

"Statutorily prescribed policy provisions which require, as an alternative to a defined time period, that notice be given 'as soon as reasonably possible' . . . ordinarily create issues of fact as to whether a particular delay in notification was reasonable." *Todd v. Bankers Life & Cas. Co.*, 523 N.Y.S.2d 206, 207 (3d Dep't 1987) (citing, as an example, § 3216(d)(1)(G)). "However, in the absence of a reasonable excuse or mitigating factors, even relatively short periods of delay have been found to be unreasonable as a matter of law." *Id.*

With respect to the accidental death claim, plaintiff's attorney's representation that he had difficulty in obtaining certain reports is a valid excuse for his failure to provide proof of loss within 90 days; indeed, defendant does not dispute that its agents told plaintiff's attorney that there would be "no problem" as long as he submitted proof of loss as soon as he could. Therefore, whether proof of loss was submitted within a "reasonable time" presents a question of fact.

With respect to the loss of sight claim, however, the Court rejects plaintiff's contention that the proof provided for the accidental death claim also served as proof of Ms. Ajnoha's loss of eyesight. The form affidavit provided by defendant is specifically entitled "Proof of Accidental Death," and nothing in the affidavit or the other documentation apprised the defendant that plaintiff was claiming that Ms. Ajnoha had lost her sight. Plaintiff did not make such a claim until December 4, 2003, nearly two years after Ms. Ajnoha was pronounced dead. Even assuming that plaintiff could not reasonably be expected to know of the grounds for a loss of sight claim until the autopsy was performed, he was necessarily aware of the autopsy no later than March 28, 2002, when he sent a copy to defendant; he offers no justification for the additional 19 months that elapsed before he asserted a loss of sight claim. The Court therefore holds that plaintiff's proof of loss on

that claim was, as a matter of law, untimely. *See, e.g., Modern Continental Constr. Co. v. Giarola*, 812 N.Y.S.2d 115, 118 (2d Dep't 2006) (unexcused five-month delay held untimely as a matter of law).[5]

### D.  Loss of Life within 90 Days of the Accident

Defendant argues that plaintiff is barred from recovery on his accidental death claim because Ms. Ajnoha died more than 90 days after the date of the accident.  In fulfillment of its obligation at the summary judgment stage, the Court searches the record for whether a material issue of fact exists regarding Ms. Ajnoha's date of death.

Traditionally, the law defined death based only on the "medical standards . . . of irreversible cessation of cardiac and respiratory functions."  *People v. Eulo*, 63 N.Y.2d 341, 350 (1984) (citations omitted).  By the middle of the 20th century, however, medical science had developed the ability to "artificially maintain cardiorespiratory functions," a "technical accomplishment [that] called into question the universal applicability of the traditional legal and medical criteria for determining when a person has died."  *Id.*

The New York Court of Appeals faced that question in *Eulo*, in which two defendants argued that their convictions for manslaughter should be overturned because their respective victims were placed on ventilators and only "died" once that life support was withdrawn.  *See id* at 346-48.  Rejecting that argument and affirming the convictions, the Court of Appeals announced an additional legal definition of death:

> [W]hen a determination has been made according to accepted
> medical standards that a person has suffered an irreversible cessation
> of heartbeat and respiration, *or, when these functions are maintained*

---

[5]Having concluded that the proof of loss of sight was untimely as a matter of law, the Court need not address defendant's alternative arguments (1) that plaintiff's notice of claim on the loss of sight claim was also untimely, and (2) that the loss of sight claim is barred by the three-year contractual period of limitations.

> *solely by extraordinary mechanical means, an irreversible cessation
> of all functions of the entire brain, including the brain stem,* no life
> traditionally recognized by the law is present in that body.

*Id.* at 357-58 (footnotes omitted and emphasis added).

Less than two months after *Eulo*, then-Governor Cuomo appointed a "Task Force on Life and the Law" charged with studying the ethical and legal implications of recent advances in medical science, including the definition of death. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 4.56 (Exec. Order No. 56 dated Dec. 20, 1984). In a 1986 report, the task force recommended the adoption of regulations codifying the *Eulo* standard as the definition of death in New York. *See* http://www.health.state.ny.us/nysdoh/ taskfce/taskbio.htm (last visited Mar. 23, 2007). Acting on that recommendation, the New York Department of Health promulgated the following regulation in 1987:

> (a) An individual who has sustained either:
>
> > (1) irreversible cessation of circulatory and respiratory functions; or
> >
> > (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead.
>
> (b) A determination of death must be made in accordance with accepted medical standards.

N.Y. Comp. Codes R. & Regs. tit. 10, § 400.16.

A person diagnosed with irreversible cessation of all brain function is commonly referred to as "brain dead." *See, e.g., Eulo*, 63 N.Y.2d at 348. Although the New York Court of Appeals has not weighed in on the issue, several lower courts have drawn a distinction between "brain dead" and the loss of higher brain function, commonly referred to as a "persistent vegetative state." *See, e.g., People v. Bonilla*, 467 N.Y.S.2d 599, 606 (2d Dep't 1983) ("Brain death . . . must be distinguished from the [case of] persistent vegetative state[.]"), *aff'd*, 63 N.Y.2d at 360. One

lower court has noted that "[w]hile [individuals in a persistent vegetative state] have lost all cognitive functions, they respond to visual and auditory stimuli and often breath on their own," and that "[u]nder the New York standard such persons are alive." *Alvarado v. New York City Health & Hosp. Corp.*, 547 N.Y.S.2d 190, 195 (Sup. Ct. 1989), *order vacated and appeal dismissed as moot*, 550 N.Y.S.2d 353 (1st Dep't 1990). Other courts have recognized that a persistent vegetative state may be more severe and, in extreme cases, may be irreversible and preclude any hope of recovery. *See, e.g., Elbaum v. Grace Plaza of Great Neck, Inc.*, 544 N.Y.S.2d 840, 841 (2d Dep't 1989) (patient was in "an irreversible, persistent, vegetative state without hope of recovery"). The Court is unaware of any decision, however, in which such a person was found to be "dead" under New York's definition.

Defendant argues, through the affidavit of Dr. Connors, that Ms. Ajnoha remained in a persistent vegetative state until she was pronounced dead on November 10, 2001. In rebuttal, plaintiff offers the affidavit of Dr. Fleischer, who opines that she was brain dead on June 11, 2001, 63 days after the April 9th accident. This disagreement demonstrates that a genuine issue of material fact exists as to the date of Ms. Ajnoha's death: If Dr. Fleischer is correct, Ms. Ajnoha was legally dead within 90 days of the accident and plaintiff is not barred from recovery by the Certificate's 90-day clause. If, by contrast, Dr. Connors is correct and New York's definition of death was not satisfied at any time within the 90-day period, the Court must then determine whether, as plaintiff argues, the 90-day provision is, under the circumstances, unenforceable as against public policy. *See Burne v. Franklin Life Ins. Co.*, 301 A.2d 799, 802 (Pa. 1973) (holding that 90-day clause violated Pennsylvania's public policy where "it was only due to extraordinary efforts on the part of attending physicians implementing the most advanced medical techniques available that [the claimant's] husband was kept scientifically alive [beyond the 90-day period]"). Even in the abstract,

the public policy argument is profound, inasmuch as no New York court has addressed it in the context of a person being kept alive by extraordinary means. *Cf. Weickselbaum v. Commercial Travelers Mut. Accident Ass'n*, 129 N.Y.S.2d 612, 613 (Sup. Ct. 1954) (upholding 90-day clause in case not involving extraordinary means). But if the Court must decide the issue, it must do so based on the facts of this case, taking into account such considerations as whether Ms. Ajnoha's condition, if something short of brain death, was nevertheless irreversible (i.e., whether or not she could be expected to recover lost brain function) and whether there was any hope of recovery (i.e., her prognosis, including whether or not her condition would inevitably result in death); it would be premature to address the public policy issue until these factual disputes are resolved.

**E. Injury Resulting Directly and Independently of All Other Causes**

Defendant makes two related arguments that Ms. Ajnoha's preexisting condition (i.e., brain cyst) precludes recovery under the Certificate: (1) her injuries were "due to disease [or] bodily . . . infirmity," Certificate at 5; and therefore (2) did not result "directly and independently of all other causes," *id.* at 3.

The New York Court of Appeals addressed the effect of a preexisting condition on recovery under an accidental death policy in the seminal case of *Silverstein v. Metropolitan Life Ins. Co.*, 254 N.Y. 81 (1930). In *Silverstein*, the insured slipped and fell; the fall caused a perforation in the insured's stomach, "through which the contents of the stomach escaped into the peritoneum, causing peritonitis and, later, death." *Id.* at 83. The insurance company denied recovery under an accidental death policy, arguing that the insured had an ulcer that had weakened the stomach wall, "with the result that the impact of the [fall] was followed by perforation at the point of least resistence." *Id.* at 83-84.

Rejecting the insurance company's argument, the Court of Appeals noted that a "policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules"; in order to bar recovery, "[t]he disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men." *Id.* at 84. The *Silverstein* court further explained:

> A distinction . . . is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency.

*Id.* (citations omitted). Applying this test, the court held that the ulcer did not bar recovery because "[i]f dormant, as it was found to be, it was not only harmless in itself, but incapable of becoming harmful except through catastrophic causes, not commonly to be expected." *Id.* at 84.

*Silverstein* remains the standard by which preexisting conditions are judged under New York law. In *McMartin v. Fidelity & Casualty Co.*, 264 N.Y. 220 (1934), the Court of Appeals held that the insured's death was not caused by an automobile accident "directly and independently

of all other causes" because the insured suffered from chronic, progressive kidney disease, the effects of which had been exacerbated by the accident. *See id.* at 223 ("Nephritis existent for at least three years, chronic and progressive, may not with any fitness of language or with any sense of reality be described as a mere predisposing tendency. It is a condition which in its natural and probable development may be expected to be a source of mischief, and so a disease."). More recently, the Second Department held that recovery on an accidental death policy was barred because "the decedent's underlying cirrhosis of the liver at the time of the accident was a disease which contributed to her death." *Bozic v. JC Penney Life Ins. Co.*, 744 N.Y.S.2d 189, 189 (2d Dep't 2002). By contrast, in *Bernstein v. American Home Assurance Co.*, 395 N.Y.S.2d 532 (2d Dep't 1977), the Second Department held that a "bleb" left on the insured's eye after a recent cataract operation "was nothing more than a predisposing weakness or frailty in the eye which made it more susceptible to infection by harmful bacteria." *Id.* at 533.

In *Sugarman v. New England Mutual Life Insurance Co.*, 201 F. Supp. 759 (E.D.N.Y. 1962), the plaintiff sought recovery on an accidental death policy, arguing that her husband's death resulted from an undiagnosed brain aneurysm that had ruptured following a blow to the head. The late and highly esteemed Judge Dooling of this Court described the *Silverman* dichotomy thusly:

> [T]he law of New York is incontrovertibly settled that where two equally indispensable causes concur to produce death and one of the indispensable causes is an accident that would not produce death in the average instance and the other indispensable cause is an abnormal condition in the insured's body, such language as the insured and insurer here agreed upon does not absolutely preclude recovery of the indemnity payable upon accidental death; the bodily abnormality that concurs to cause death must respond to a particular qualitative analysis to preclude recovery. . . .The *Silverstein* case impliedly defines the abnormality that will not preclude recovery; if the bodily condition is not of itself capable of doing significant mischief and would not, therefore, commonly be called, if known, a diseased condition, it does not preclude recovery even though without it the accidental cause could not produce death.

*Id.* at 762. Judge Dooling then held that "[a]s a matter of law the morbidity of the artery bearing the aneurysm the rupture of which caused death was a grave infirmity or disease; its role in producing death precludes recovery even if an accidental blow or fall produced that increase in intracranial pressure that effected the fatal rupture of the aneurysm," *id.*; in so holding, he described the aneurysm as "a developmental abnormality . . . capable, unaided of any external stimulus, of producing death though not, even in extended time, certain to do so." *Id.* at 760-61. On the other side of the dichotomy, the court in *Amend v. Equitable Life Assurance Co.*, 342 N.Y.S.2d 284 (Civ. Ct. 1972), held that a ruptured aneurysm that had contributed to the insured's death was a "quiescent condition which is static or a predisposing tendency" and, therefore, did not bar recovery. *Id.* at 287.

Like causation generally, whether an insured's death was caused by an accident "directly and independently of all other causes" is a question of fact. *See LeGlaire v. New York Life Ins. Co.*, 186 N.Y.S.2d 291, 294 (1st Dep't 1959) ("Of course it was for the jury to determine the cause of death."). While the parties' medical experts agree that the cyst in Ms. Ajnoha's brain played some role in her death, the competing affidavits of Drs. Bloomfield and Miller reveal a genuine dispute as to whether the cyst was a disease or bodily infirmity, or merely a predisposing tendency; therefore, defendant is not entitled to summary judgment on that issue.

# III.

Defendant argues that plaintiff waived his right to a jury trial under Federal Rule of Civil Procedure 81(c) when he failed to serve a demand within 10 days of removal, and that Rule 39(b) – which permits a court order a jury trial where a party failed to demand one under Rule 38 – does not apply to cases of removal.

Rule 81(c) governs demands for jury trial in removed cases:

> If at the time of removal all necessary pleadings have been served, a party entitled to trial by jury under Rule 38 shall be accorded it, if the party's demand therefor is served . . . within 10 days after service on the party of the notice of filing the petition**. . . .**

> A party who, prior to removal, has made an express demand for trial by jury in accordance with state law, need not make a demand after removal.

> If state law applicable in the court from which the case is removed does not require the parties to make express demands in order to claim trial by jury, they need not make demands after removal unless the court directs that they do so within a specified time if they desire to claim trial by jury. . . .

> The failure of a party to make demand as directed constitutes a waiver by that party of trial by jury.

*Id*. Since defendant did not file an answer before removing the case, the first circumstance is not applicable.

With respect to the second circumstance, plaintiff did not serve a jury demand prior to removal; nor could he since no note of issue had been filed: Under New York law, jury demands are not made until the case is ready for trial, at which time "[a]ny party may demand a trial by jury of any issue of fact triable of right by a jury, by serving upon all other parties and filing a note of issue containing a demand for trial by jury." N.Y. C.P.L.R. § 4102(a); *see also* 22 N.Y. Comp. Codes R. & Regs. § 202.21 (describing contents of note of issue). This contrasts with federal

practice, which does not provide for a "note of issue," and requires, subject to Rule 81(c)'s special provisions for removed cases, that a jury demand be made "not later than 10 days after the service of the last pleading directed to [an] issue [triable of right by a jury]."  Fed. R. Civ. P. 38(b).

With respect to the third circumstance, New York law, although requiring an express jury demand, does not, unlike federal law, provide a fixed deadline since the time for filing a note of issue depends on when the case is ready for trial.  In addition, New York provides that "[t]he court may relieve a party from the effect of failing to [include a jury demand in the note of issue] if no undue prejudice to the rights of another party would result."  N.Y. C.P.L.R. § 4102(e). Recognizing these provisions of state law, the Second Circuit has construed Rule 81(c) to allow a district court, in its discretion, to excuse an untimely jury demand in removed cases, in much the same way that Rule 39(b) allows a court, in its discretion, to order a jury trial "notwithstanding the failure of a party to demand a jury" in cases commenced in federal court:

> [A] discretionary right must be read into the language of Rule 81(c); it comports also with Rule 39(b). The framers of Rule 81(c), taking into account the clear cut situations where state law either requires a demand or not, did not expressly consider the gray situation . . . where state law permits discretionary relief.

*Higgins v. Boeing Co.*, 526 F.2d 1004, 1007 (2d Cir. 1975). In *Higgins*, the Second Circuit remanded the case to the district court and established three factors for the court to consider in determining whether to grant an untimely jury demand in removed cases: (1) whether the issues in the case are those traditionally triable by a jury; (2) whether the parties were operating on the assumption that the trial would be a bench trial; and (3) whether the opposing party acquiesced in the jury demand or, if not, whether that party would be unduly prejudiced should the court order a jury trial. *See id.* While identifying these three factors, the court emphasized that "there are conceivably other factors of which [it was] not aware that might weigh otherwise," and left the decision whether to grant a jury trial within the "sound discretion" of the district court. *Id.*; *see also Cascone v. Ortho Pharmaceutical Corp.*, 702 F.2d 389, 393 (2d Cir. 1983) (approving, in addition to factors enunciated in *Higgins*, consideration that "plaintiff's counsel is essentially a state court practitioner having greater familiarity with New York practice and was admitted to practice in the federal courts only a year before this suit was filed").

Although the issues presented here are traditionally triable by a jury, *see Atlas Roofing Co. v. OSHA*, 430 U.S. 442, 459 (1977) ("[S]uits for damages for breach of contract . . . were suits at common law with the issues of the making of the contract and its breach to be decided by a jury."), the defendant nonetheless operated for almost two years on the assumption that the trial would be a bench trial. Accordingly, and in the exercise of its discretion, the Court grants defendant's motion to strike plaintiff's jury demand as untimely. Without minimizing the importance of the right to a jury trial in a suit for damages for breach of contract, the Court notes

that the case is uniquely suited for a bench trial due to the highly technical nature of the evidence likely to be presented and the detailed findings that the fact-finder will be required to make. Moreover, since most of the witnesses will be doctors – whose schedules are notoriously difficult to coordinate – a bench trial will allow the Court to adjourn the trial as necessary to accommodate these witnesses, an accommodation that would be unworkable were the case to proceed as a jury trial. Finally, as Judge Friendly once noted, "[t]here is, of course, not the slightest reason to doubt that a judge is quite as able as a jury to make a fair determination." *Noonan v. Cunard S.S. Co.*, 375 F.2d 69, 72 (2d Cir. 1967).

## CONCLUSION

Defendant's motion for summary judgment is granted with respect to the loss of sight claim. With respect to the accidental death claim, the parties' motions for summary judgment are denied and defendant's motion to strike plaintiff's jury demand is granted. The case will proceed to trial before the Court on the following issues:

1.  Whether plaintiff provided defendant with proof of loss regarding the accidental death claim "as soon as reasonably possible."

2.  Whether Ms. Ajhona was dead, as New York law defines that term, within 90 days of the accident, and if not, the nature and severity of her condition.

3.      Whether Ms. Ajhona's brain cyst was a "disease or bodily infirmity", such that her death was not caused by the accident "directly and independently of all other causes," or merely a predisposing tendency.

**SO ORDERED.**


_____/S/_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 30, 2007